UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11456-RWZ

|  |  |
|---|---|
| GENERAL ELECTRIC MORTGAGE INSURANCE CORPORATION,<br><br>Plaintiff,<br>Judgment Creditor,<br>v.<br><br>CHI CHEN<br>A/K/A CHI CHEN HU,<br>A/K/A TRACY CHEN,<br><br>Defendant<br>Judgment Debtor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**GENERAL ELECTRIC MORTGAGE INSURANCE CORPORATION'S
OPPOSITION TO "MOTION FOR TURNOVER OF FUNDS" OF CHING YEE M. TSUI
DATED MAY 20, 2005**

Judgment creditor General Electric Mortgage Insurance Corporation ("GEMIC") opposes

the motion of Ching Yee M. Tsui ("Tsui") for turnover of funds.   GEMIC suggests that Tsui

must serve a motion for dissolution of attachment and comply with all procedural requirements

of said rule, Mass. R. Civ. P. 4.1 (g).  Tsui has already filed such a motion in the Middlesex

County Superior Court and had an extensive hearing before Associate Justice Paul Chernoff.

Said Tsui motion was denied in a memorandum written by Judge Chernoff.  Tsui appealed Judge

Chernoff's order to a Single Justice of the Massachusetts Appeals Court. Associate Justice Raya

Dreben affirmed Judge Chernoff and dismissed Tsui's appeal.  Judge Chernoff has ordered an

evidentiary hearing. No such hearing has taken place.  Tsui now asks a Federal District Court to essentially review a rendered state court order which she has initiated and appealed unsuccessfully.   Pursuant to the *Rooker-Feldman* doctrine this appears to be impermissible. Moreover, Tsui is precluded from the sought relief because the show cause order remains  in effect, as noted during the April 21, 2005 status conference.  Moreover, Tsui has not produced all of the documents sought in the subpoena *duces tecum* served upon her in August 2004.

During the May 16, 2005 deposition Tsui's attorney followed instructions not to answer certain questions posed to her by GEMIC.   GEMIC contends that said instructions not to answer were not proper (and prejudiced GEMIC)  and that failure to produce the requested documents (especially when all objections to rule 45 subpoenas are waived unless interposed within ten days) was also prejudicial.  While it is true that Tsui served  a response (which included objections) to the August 22, 2004 subpoena duces tecum shortly after commencement of the deposition on May 16, 2005, said objections must be disregarded in light of the established  rule that objections to a Rule 45 subpoena must be served within 10 days. Under this long standing rule,  Tsui's objections, if any, were due on September 1, 2004.  Filing objections 9 ½  months after service of the subpoena is untimely under any calculation. GEMIC also forwarded a letter to Tsui's attorney  indicating that it viewed late filed objections to be waived and expressing a desire to move the case forward rather than relitigate waived matters.

New factual developments also militate against Tsui's requested relief.  Judgment debtor Michael Hu ("Hu") has been located.  According to his attorney Andrew H. Wu, Esquire ("Wu") of San Jose, California,   Hu  is gainfully employed in the Silicon Valley. ***What is more important, Wu reported Hu and Tsui moved to the Silicon Valley together as husband and***

2

***wife during February 2003.*** While Tsui has claimed that Hu abandoned Tsui and that Tsui is estranged from Hu, Wu, Hu's divorce attorney, disputes this contention. In fact, Wu reports to GEMIC that Hu and Tsui have purchased two pieces of real estate together in California, the second as recently as April 15, 2004. Tsui has told the Massachusetts Superior Court she resided in Hong Kong, China but public records recently discovered indicates she has been residing in San Jose, California where she collected unemployment compensation from the Commonwealth of Massachusetts and instructed the Commonwealth to forward said unemployment compensation to a San Jose Post Office Box. Although Tsui has claimed she is estranged and claims not to know where Hu resides, she and Hu remain as co-buyers in the California real estate market, an area of this country with rising real estate values. As recently as April 15, 2004, Hu quitclaimed his interest in a San Jose property to Tsui for valuable consideration. Tsui now claims to be unemployed — at deposition she claims her "aunt" supports her – nevertheless she and Hu appear to be co-obligors on a San Jose property with a $548,000.00 mortgage where Attorney Wu reports Hu resides.

Tsui's latest motion violates Local Rule 7.1(A) which requires that the moving party initiate a conference prior to a motion being filed. It is undisputed no such conference occurred. This is the second time in which Tsui has violated this Local Rule 7.1(A); she filed a motion in 2004 without conducting a conference. Tsui does as she pleases: she filed an opposition to GEMIC's motion to amend complaint though she lacks standing as she is not a party. When it came time to prepare the scheduling order filed with this Court on October 28, 2004 she declined to participate alleging she is not a party. Tsui cannot claim she is not a party on October 28, 2004 and on May 20, 2005 file an objection to a motion to amend complaint.

Tsui testified on May 16, 2005 Michael Hu and the business that Tsui and Hu owned together that she had no recollection of a bank account for either Michael Hu or Systems Communications, Inc. during the years 1998 to 2003. Tsui testified she deposited five figure Systems checks into her account and wrote checks for the family expenses using Systems funds. Tsui further testified that Hu made substantial deposits into said account at a time when Tsui was making a student hourly rate at Rivier College in Nashua, New Hampshire where she was a student. During this time period Tsui admits Hu (or Systems) deposited some $33,000.00 into Tsui's account; another time Hu (or Systems) deposited some $14,000.00

According to Tsui's testimony, she claimed she was forced to sell 36 Russell's Way Westford, Massachusetts claiming she could not afford the monthly obligations it and she was unemployed. According to public records, and her sworn May 16, 2005 testimony, she bought another house with Hu with a mortgage balance of $548,000 (twice the mortgage of 36 Russell's Way) while she claimed she was unemployed and her sole source of income was Massachusetts unemployment benefits that were sent by U.S. Mail to her post office box in Santa Clara, California. Tsui testified she did not know the whereabouts of her husband Michael Hu and Atty. Wu disclosed Hu resides in a brand new house located at 4756 Calendula Court, San Jose, California 95136 with a $548,000 mortgage balance.

One of the reasons the Tsui deposition occurred on May 16, 2005 rather than an earlier date was that Tsui told the Court she was "starting a new job." According to the docket of her divorce action, Tsui physically appeared in a Californian courtroom for a status conference on concerning her divorce action on April 27, 2005 in San Jose, California, though Tsui caused information to be delivered to this Court on April 21, 2005 she was unable to appear for

4

deposition during the week of April 25, 2005 because she was starting a new job. Tsui now claims to be a student at a New Jersey college, the Chubb Institute, studying  medical billing.

It is unclear at this juncture how Tsui, a full time student with no source of income,  can qualify, let alone afford,  a $548,000 mortgage in San Jose, California.  At prevailing interest rates coupled with typical carrying charges one would have to pay approximately $4,000.00 per month to support such a property. This amounts to $48,000.00 per year. It would appear that another person is actually paying for this property and based upon the credible evidence that person appears to be Michael Hu,  the judgment debtor. It also appears from the credible evidence that this property is also owned by Michael Hu.

GEMIC requires additional discovery so that it can adequately set forth its position with reference to this entire matter.  GEMIC believes that it has been lead on a "wild goose chase" by Tsui claiming to be running away from her abusive husband and residing in Hong Kong, when the evidence recently discovered by GEMIC indicates that Hu and Tsui left Westford, Massachusetts to start a new life together in California where they bought two pieces of expensive property and that the representations made that she was residing in Hong Kong were fabricated in a continuing effort by both Michael Hu and Tsui to throw Hu's  lawful creditors off his back.

Tsui testified on May 16, 2005 that in her pending divorce action, Docket No. 1-05-FL-124146 pending in Santa Clara County California Family Court she is not claiming the attached monies.  This constitutes judicial estoppel.  In other words, if Tsui is disclaiming ownership of the attached funds, she cannot lie claim to the same funds in this Court.

According to Tsui's sworn testimony she and Hu have filed joint tax returns for each year she and Hu claim they are estranged yet she claims she has no idea where he resides.

On April 21, 2005, this Federal Court stated that if matters are plead in an amended complaint then Tsui must answer these matters at deposition. GEMIC delivered the amended complaint to Tsui at her deposition on May 16, 2005. I t was filed with this Court the next day, on May 17, 2005.  Notwithstanding this, Tsui was instructed not to answer questions concerning certain averments in said amended complaint.

In light of the new facts discovered on May 16, 2005, GEMIC requires additional time to investigate the divorce action and the California properties.  Atty. Wu has agreed to a meeting on June 6, 2005 at noon in an effort to seek a logical conclusion to this lawsuit. GEMIC also seeks to meet with certain fact witnesses located in California.

WHEREFORE, GEMIC prays that this Honorable Court:

I.    Deny Motion For Order Directing Turnover Of Funds To Ching Yee M. Tsui

      dated May 20, 2005;

II.    For further relief the Court deems just and proper.

                              General Electric Mortgage Insurance Corporation,
                              Plaintiff/Judgment Creditor,
                              By its attorney,
                              _____
                              Richard W. Gannett, Esquire
                              BBO #184430
                              Gannett & Associates
                              165 Friend Street, Suite 200
                              Boston, MA 02114-2025
                              (617) 367-0606

Dated: May 31, 2005

## CERTIFICATE OF SERVICE

       I, Richard W. Gannett, hereby certify that on May 31, 2005, I served a copy of General
Electric Mortgage Insurance Corporation's Opposition To Motion For Turnover Of Funds Of
Ching Yee M. Tsui upon the following individual, by hand delivery, upon:

Michael B. Feinman, Esq.
Feinman Law Offices
23 Main Street
Andover, MA 01810

                              _____
                              Richard W. Gannett

# Register of Actions/Docket

**Case Information**                                                                 **Associated Cases**

Number: **1-05-FL-124146**

Title: **Ching Y. Tsui And Cheng-Yih Hu**

Category: **Dissolution Of Marriage/No Minor**

Filed: **1/3/2005** Disposed: Status: **Open**

Calendared Events                         **Involved Parties**                         Documents

| Type | Name | Disposition |
|------|------|-------------|
| Petitioner | Ching Yee Millor Tsui | None |
| | **Attorney:** | Dale N. Chen<br>Dale N. Chen Law Offices , 147 Castro Street, Suite 2-A, Mountain View, Ca 94041 |
| Respondent | Cheng-Yih Hu | None |
| | **Attorney:** | Andrew H Wu<br>95 South Market Street, Suite 300, San Jose, Ca 95113 |

Involved Parties                         **Calendared Events**                         Documents

| Date | Time | Event Description | Result | | | Notice Printed | Reset | |
|------|------|-------------------|--------|--|--|----------------|-------|--|
| | | | Description | By | Date | | To | From |
| 4/27/2005 | 09:16AM | FL Case Management Conf | Stipulation | C | 04/27/05 | None | None | 03/30/2005 |
| 3/30/2005 | 09:16AM | FL Case Management Conf | Cont; future month | C | 03/17/05 02/08/05 | None | 04/27/2005 | None |
| 3/28/2005 | 09:00AM | FL Trial-Short Cause | Vacated | C | 03/28/05 | None | None | None |
| 3/16/2005 | 09:00AM | FL Settlement Conference | Orders Issued | C | 03/16/05 | None | None | None |
| 2/3/2005 | 09:00AM | FL OSC/TRO | Set for S/C & Trial | C | 02/03/05 | None | None | None |

Involved Parties                         **Documents**                         Calendared Events

| Number-Sequence | Document Description | Filed | Ruling | Date |
|-----------------|---------------------|-------|--------|------|
| 0014-000 | Fl Case Management Questionnaire | 04/27/2005 | None | 04/27/2005 |
| | **For:** Cheng-Yih Hu / RSP | | | |
| 0013-000 | Fl Order After Hrg | 04/19/2005 | None | 04/19/2005 |

| | **For:** Ching Yee Millor Tsui / PTR | | | |
|---|---|---|---|---|
| 0012-000 | Fl Stip To Temp Judge/Comm | 03/16/2005 | None | 03/18/2005 |
| | **For:** Ching Yee Millor Tsui / PTR<br>**For:** Cheng-Yih Hu / RSP | | | |
| 0011-000 | Fl-Ntc:Case Management Conf | 03/17/2005 | None | 03/17/2005 |
| 0010-000 | Fl-Ntc:Case Management Conf | 02/08/2005 | None | 02/08/2005 |
| 0009-000 | Fl Resp Decl:Osc/Ntc Of Mtn | 01/31/2005 | None | 02/03/2005 |
| | **For:** Cheng-Yih Hu / RSP | | | |
| 0008-000 | Income/Expense Declaration | 01/31/2005 | None | 02/03/2005 |
| | **For:** Cheng-Yih Hu / RSP | | | |
| 0007-000 | Fl Proof Of Svc By Mail | 01/31/2005 | None | 02/03/2005 |
| | **For:** Cheng-Yih Hu / RSP | | | |
| 0006-000 | Fl Response | 01/31/2005 | None | None |
| | **For:** Cheng-Yih Hu / RSP | | | |
| 0005-000 | Fl Proof Of Svc Of Summons | 01/28/2005 | None | 01/28/2005 |
| | **For:** Ching Yee Millor Tsui / PTR | | | |
| 0004-000 | Fl Temp Restraining Ord [Tro] | 01/11/2005 | None | None |
| | **For:** Ching Yee Millor Tsui / PTR | | | |
| 0003-000 | Fl Osc/Ro | 01/11/2005 | None | 02/04/2005 |
| | **For:** Ching Yee Millor Tsui / PTR | | | |
| 0002-000 | Fl Petn:Dissolution Of Marriage/No Minor | 01/03/2005 | None | None |
| | **For:** Ching Yee Millor Tsui / PTR | | | |
| 0001-000 | Fl Summons | 01/03/2005 | None | 01/03/2005 |
| | **For:** Ching Yee Millor Tsui / PTR | | | |

RETURN

**RECORDING REQUESTED BY**
First American Title Company

**AND WHEN RECORDED MAIL TO:**
Ching Yee M. Tsui
4756 Calendula Court
San Jose, CA

DOCUMENT: 17724276                   Pages: 3

Fees ...      13.00
Taxes...
Copies
AMT PAID      13.00

BRENDA DAVIS                          RDE # 022
SANTA CLARA COUNTY RECORDER           4/15/2004
Recorded at the request of           8:00 AM
First American Title Company
Space Above This Line for Recorder's Use Only

A.P.N.: 464-43-044-pm                            File No.: 4331-754322-066 (CM)

# INTERSPOUSAL TRANSFER GRANT DEED
(Excluded from Reappraisal under California Constitution Article 13A § 1 et seq.)

The Undersigned Grantor(s) declare(s):  DOCUMENTARY TRANSFER TAX **$n/a**; CITY TRANSFER TAX **$n/a**; This conveyance is solely between spouses and establishes the sole and separate property of a spouse and is EXEMPT from the imposition of the Documentary Transfer Tax pursuant to § 11911 of the Revenue and Taxation Code.

This is an Interspousal Transfer and not a change in ownership under Section 63 of the Revenue and Taxation Code, and transfer by Grantor(s) is excluded from reappraisal as a creation, transfer, solely between the spouses of any co-owner's interest.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, **Cheng-Yih Hu, a married man, spouse of Grantee herein**

hereby GRANTS to **Ching Yee M. Tsui, a married woman, as her sole and separate property**

the following described property in the City of **San Jose**, County of **Santa clara**, State of **California**:

**Attached hereto as Exhibit A.**

**It is the express intent of the Grantor, being the spouse of the Grantee, to convey all right, title and interest of the Grantor, community or otherwise, in and to the herein described property to the Grantee as his/her sole and separate property.**

Dated:   **04/01/2004**

Cheng-Yih Hu

Mail Tax Statments To:  **SAME AS ABOVE**

A.P.N.: 464-43-044                                    File No.: 4331-754322-066 (CM)

STATE OF      __California_____      }
                                          } ss.
COUNTY OF    __Santa Clara_____      }

On _4-5-04_____ , before
me, _Sylvia Erazo_____ personally
appeared _Cheng-yih  Hu_____ ,
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose
name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies) and that his/her/their signature(s) on the instrument the person(s) or the
entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.              *This area for official
                                                notarial seal*

Signature _____

My Commission Expires: __3-17-06_____

SYLVIA ERAZO
COMM. # 1346921
NOTARY PUBLIC CALIFORNIA
SANTA CLARA COUNTY
COMM. EXP. MARCH 17, 2006

Page 2

A.P.N.: **464-43-044**         Interspousal Transfer Grant Deed - continued         File No.: **4331-754322-066**
**(CM)**

## EXHIBIT A

**Lot 66, as shown on that certain Map entitled "Tract No. 9458", which Map was filed in the office of the Recorder of the County of Santa Clara, State of California on June 26, 2003, in Book 762 of Maps page(s) 1 through 4.**

**Excepting therefrom the underground water rights without rights of surface entry as conveyed to San Jose Water Company, a California corporation, by Deed recorded September 3, 2003, as Document No. 17315680 of Official Records.**

**LAS BRISAS**

*First American Title, Co.*
*4331-754322.066*

Recording Requested By:
HCL FINANCE, INC.


And After Recording Return To:
HCL FINANCE, INC.
2560 MISSION COLLEGE BOULEVARD, SUITE 102
SANTA CLARA, CALIFORNIA 95054
Loan Number: R12030054MCA


———————————— [Space Above This Line For Recording Data] ————————————

# DEED OF TRUST

**MIN:** 1000673-0100023862-6

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** **"Security Instrument"** means this document, which is dated APRIL 6, 2004 , together with all Riders to this document.
**(B)** **"Borrower"** is CHING YEE M. TSUI, A MARRIED WOMAN


Borrower is the trustor under this Security Instrument.
**(C)** **"Lender"** is HCL FINANCE, INC.

Lender is a CALIFORNIA CORPORATION organized and existing under the laws of CALIFORNIA
Lender's address is 2560 MISSION COLLEGE BOULEVARD, SUITE 102, SANTA CLARA, CALIFORNIA 95054

**(D)** **"Trustee"** is FIRST AMERICAN TITLE COMPANY


**(E)** **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(F)** **"Note"** means the promissory note signed by Borrower and dated APRIL 6, 2004 .
The Note states that Borrower owes Lender FIVE HUNDRED FORTY-EIGHT THOUSAND AND 00/100                    Dollars (U.S. $ 548,000.00          ) plus interest.

*DocMagic eForms* 800-649-1362
www.docmagic.com

Ca3005.mzd.1.tem

Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than
MAY 1, 2034 .

**(G)   "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(H)   "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under
the Note, and all sums due under this Security Instrument, plus interest.
**(I)    "Riders"** means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are
to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☒ Other(s) [specify] |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | PREPAYMENT RIDER TO SECURITY INT |

**(J)   "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and
administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial
opinions.
**(K)   "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges
that are imposed on Borrower or the Property by a condominium association, homeowners association or similar
organization.
**(L)   "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft,
or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or
magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term
includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by
telephone, wire transfers, and automated clearinghouse transfers.
**(M)   "Escrow Items"** means those items that are described in Section 3.
**(N)   "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any
third party (other than insurance proceeds paid under the coverages described in Section 5) for:  (i) damage to, or
destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in
lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(O)   "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(P)   "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note,
plus (ii) any amounts under Section 3 of this Security Instrument.
**(Q)   "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing
regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or
successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument,
"RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan"
even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
**(R)   "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that
party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and
assigns) and the successors and assigns of MERS.  This Security Instrument secures to Lender:  (i) the repayment of
the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's
covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower irrevocably grants
and conveys to Trustee, in trust, with power of sale, the following described property located in the
                    COUNTY   of           SANTA CLARA                    :
            [Type of Recording Jurisdiction]                [Name of Recording Jurisdiction]

Ca3005.mzd.2.tem

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N. #: 464-43-044

which currently has the address of   4756  CALENDULA  COURT

[Street]

SAN  JOSE                        , California        95136                    ("Property Address"):

[City]                                          [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements,
appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be
covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."
Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security
Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors
and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose
and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling
this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right
to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record.
Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any
encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with
limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1.    Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall
pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late
charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due
under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other
instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid,
Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in
one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check,
treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured
by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other
location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return
any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender
may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights
hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not
obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of
its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds

Ca3005.mzd.3.tem

# ORIGINAL

VOLUME I
PAGES:  1 - 170
EXHIBITS:  1 - 7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11456-RWZ

----------------------------------------

GENERAL ELECTRIC MORTGAGE          )
INSURANCE CORPORATION,             )
                  Plaintiff,       )
                  Judgment Creditor,  )
v.                                 )
                                   )
CHI CHEN, A/K/A CHI CHEN HU,       )
A/K/A TRACY CHEN, and              )
CHENG-YIH HU, A/K/A MICHAEL HU,    )
                  Defendants,      )
                  Judgment Debtors.  )
----------------------------------------

        DEPOSITION OF CHING YEE MILLOR TSUI, taken on

behalf of the Plaintiff, Judgment Creditor, pursuant to

the applicable provisions of the Federal Rules of Civil

Procedure, before Ariane L. Baker, Certified Shorthand

Reporter and Notary Public within and for the

Commonwealth of Massachusetts, at the Massachusetts Bar

Association, 20 West Street, Boston, Massachusetts, on

Monday, May 15, 2005, commencing at 9:20 a.m.

**DANILECKI REPORTING**
234 Governors Road
Quincy, Massachusetts 02169
617-745-9786

2

1      **APPEARANCES:**

2

3      Richard W. Gannett, Esquire

            GANNETT & ASSOCIATES
4
            165 Friend Street
5
            Suite 200
6
            Boston, Massachusetts 02114
7
            617-367-0606
8
            Counsel on Behalf of the Plaintiff,
9
            Judgment Creditor
10

11     Michael B. Feinman, Esquire
12
            FEINMAN LAW OFFICES
13
            Bank of America Building
14
            23 Main Street
15
            Andover, Massachusetts 01810
16
            978-475-0080
17
            Counsel on Behalf of Ching Yee Millor Tsui
18

19

20

21

22

23

24

3

1                              **I N D E X**

2    WITNESS                    DIRECT      CROSS      REDIRECT

3    CHING YEE MILLOR TSUI

4     (By Mr. Gannett)            4

5

6

7

8                            **E X H I B I T S**

9    NO.                      DESCRIPTION                      PAGE

10   1            Subpoena.................................25

11   2            Amended Complaint.........................41

12   3            Affidavit of Ching Yee M. Tsui.............52

13   4            Massachusetts Board of Registration of

14                Real Estate Brokers and Salesmen..........91

15   5            Letter dated April 9, 2002 to

16                Eric Levine from Richard Gannett.........105

17   6            Order...................................116

18   7            Uniform Residential Loan Application......149

19

20

21

22

23

24    (The exhibits were retained by Mr. Gannett.)

4

1                    P R O C E E D I N G S

2                    MR. GANNETT:  Stipulations, Counsel?

3                    MR. FEINMAN:  I want her to be able

4     to read and sign.  We'll waive notary.  Reserve

5     objections, except as to form, until the time of trial.

6                    MR. GANNETT:  Fine.  Agreed.

7                    * * * * * *

8           CHING YEE MILLOR TSUI, the witness,

9     having been duly cautioned and sworn, testified as

10    follows:

11                   * * * * * *

12           DIRECT EXAMINATION BY MR. GANNETT:

13    Q.    Could you state your name, ma'am.

14    A.    My name is Ching Yee Millor Tsui.

15    Q.    And you pronounce your last name Tsui?

16    A.    Tsui.

17    Q.    Tsui?

18    A.    Tsui.

19    Q.    And are you here represented by counsel, by

20    an attorney?

21    A.    Yes.

22    Q.    And it's Mr. Feinman?

23    A.    Yes.

24    Q.    And are you aware of this lawsuit?

33

1                    MR. FEINMAN:  Objection.

2        A.    I don't understand your question.

3        Q.    Okay.  Have you filled out a financial

4   statement about your marital situation and any of your

5   assets or liabilities in your divorce, as is typical?

6                    MR. FEINMAN:  Objection.

7             BY MR. GANNETT:

8        Q.    You can answer.

9                    MR. FEINMAN:  Go ahead.  You can

10  answer it.  Did you fill out a financial statement?

11                   THE WITNESS:  Yes.

12            BY MR. GANNETT:

13       Q.    Okay.  Did you list the house or the proceeds

14  from the sale of the house at 36 Russell's Way in

15  Westford as money belonging to you?

16       A.    I did not.

17       Q.    Did you see Mr. Hu's financial statement?

18       A.    No.

19       Q.    Do you know who his lawyer is?

20       A.    I remember the first name of his lawyer, not

21  the last name.

22       Q.    Do you know how long he's been in the San

23  Jose, Mountain View area, Mr. Hu?

24       A.    I don't know.

48

1      A.     I did not get a paycheck from System

2  Communications.

3      Q.     Well, you need money to live.  Where did your

4  money come from?

5      A.     When people pay to the company, I -- After I

6  received a check, I put it into my account -- my bank

7  account.

8      Q.     Your personal bank account?

9      A.     Um-huh.

10     Q.     Yes or no?

11     A.     Yes.

12     Q.     So you took a System Communications -- a

13  check for System Communications and put it in your own

14  bank account?

15     A.     Um-huh.

16     Q.     Yes?

17     A.     Yes.

18     Q.     Was there a checking account or a bank

19  account for System Communications?

20     A.     What do you mean?

21     Q.     Do you know what a bank is?

22     A.     Yeah.

23     Q.     Okay.  Did System Communications have a bank

24  account in a bank?

49

1      A.    I don't know.

2      Q.    But you took the checks from the customers of

3  System and put it in your own bank account?  Is that

4  what you're telling me?

5      A.    Yes.

6      Q.    And what did you do with the money after you

7  put it in there?

8      A.    Well, I spend money in my own account.

9      Q.    Well, what did you do with the money that you

10  got from the customers?

11      A.    I help Michael to pay his own expenses,

12  whatever it is.  I treat it as my income or salary for

13  my work, part of it, not all.

14      Q.    Did you pay the mortgage with that money on

15  the house?

16      A.    On the salary part that belongs to me, yes.

17      Q.    Did you have books and records?  You seem to

18  say you have books and records about it.  Where are the

19  books and records?

20              MR. FEINMAN:  Objection.  You can

21  answer.

22      A.    I did keep track in a paper, but then after I

23  am not -- After I was not working in there, I threw it

24  away.  So I don't have a record after that.

87

1    A.    Yes.

2    Q.    How about his mother, does he have a good

3 relationship with his mother, Tracy Chen?

4    A.    I cannot say.  I don't know.  We never

5 talked.

6    Q.    Do you know Tracy Chen?

7    A.    I saw her like one or two times.

8    Q.    In the recent past?

9    A.    In the past.

10    Q.    How long ago?

11    A.    I forget, but I know it's before he leave the

12 country, United States.

13    Q.    Does he still use that address, Ivan Hu, at

14 Poinciana Drive now?

15    A.    No.

16    Q.    Where does he use his address for his home?

17    A.    I don't know.

18    Q.    And you don't know where Michael Hu lives?

19    A.    No.

20    Q.    Well, in your divorce, are you looking for

21 money from Michael Hu, besides getting divorced, of

22 course?

23    A.    I take what belongs to me under the

24 California law.

102

1    Q.    So from your income at System and 3com, you

2  paid for Ivan Hu's education at Phillips Exeter Academy

3  in Exeter, New Hampshire?

4                    MR. FEINMAN:  Objection.  Answer it

5  one more time.

6    A.    Yes.

7    Q.    How much is the tuition there?

8    A.    28K, tuition and boarding.

9    Q.    $28,000?

10    A.    Um-huh.

11    Q.    Yes?

12    A.    Yes.

13    Q.    And you paid that from your own pocket?

14    A.    Yes.

15    Q.    And Michael Hu, you're testifying, didn't

16  give you any of that money?

17                    MR. FEINMAN:  Objection.

18    A.    In my belief, whatever he pay me as a family

19  support, after I get it, however and whatever I spend it

20  is my own business.

21    Q.    Well, just answer my question, please.  Did

22  you get any of that money from Michael Hu, the $28,000,

23  for Phillips Exeter up in Exeter, New Hampshire?

24    A.    I think I answered your question.

103

1    Q.    I don't think you did.  That's why I'm asking

2  you again, ma'am.  So please answer it.

3                      MR. FEINMAN:  Is there something you

4  don't understand?

5                      THE WITNESS:  Yeah.

6                      MR. FEINMAN:  Tell him what you

7  don't understand.

8    A.    Because for my own understanding, when people

9  pay money to me, it all belongs to me as my own.  So how

10  I use to spend it, like give it to a kid for tuition, is

11  my own business.

12    Q.    I'm not asking about your business, ma'am.

13  I'm just asking you the source of the money.

14    A.    So I don't know because I don't know each

15  paper and note belongs to who and who.

16    Q.    Okay.  So do you have any records of this

17  still?

18                      MR. FEINMAN:  Objection.

19    A.    Of what?

20    Q.    Of the monies that you used to come up with

21  $28,000 for Phillips Exeter.

22                      MR. FEINMAN:  Objection.

23    A.    I just write a check to --

24    Q.    Do you have the checks still?  That's the

142

1   my own income.  So I pay out of my own income.

2        Q.   Well, when he gave you money for the house,

3   what would you use the money for?

4                 MR. FEINMAN:  Objection.

5        A.   Maybe for food.  Because we don't really -- I

6   don't really itemize it, like this is the money from

7   him, so I use it for that.  But I assume that I use it

8   in like shopping, clothes, and other things.

9        Q.   Household items?

10       A.   Household items, yes, food.

11       Q.   Did you have cable TV there to watch TV?

12       A.   Huh?

13       Q.   Cable TV.

14       A.   Yes.

15       Q.   Did you pay the cable TV bill?

16       A.   Yes.

17       Q.   Did some of the money go towards the cable

18   TV?

19       A.   No.  No.

20       Q.   Well, how many checking accounts did you

21   have?

22       A.   One.

23       Q.   Did you put the System Communications' checks

24   into that checking account?

143

1    A.    Yes.

2    Q.    Do you have any of that money left?

3              MR. FEINMAN:  Objection.

4    A.    From him?

5    Q.    Not from him.  From System.

6    A.    I didn't get it for a long time.  I didn't

7  get any check from System Communications for two, three

8  years.

9    Q.    Did you get anything from him individually,

10  or cash?

11   A.    Cash.

12   Q.    Okay.  You got cash from him, right?

13   A.    Yes.

14   Q.    Did you put the cash into your bank account?

15   A.    Yes.

16   Q.    Would you spend the cash as well?

17             MR. FEINMAN:  Objection.

18   A.    Yeah.  I mean, save it up for whatever I need

19  to use.

20   Q.    How much are you asking Mr. Hu to pay you

21  every month over in California --

22             MR. FEINMAN:  Objection.

23   Q.    -- in your divorce case?

24             MR. FEINMAN:  Objection.

134

1    Q.    The HUD one.

2    A.    Yeah.

3    Q.    What was the purpose of the hearing in

4    California for your divorce?

5    A.    What was the purpose?

6    Q.    Yes.

7    A.    I was told that I was supposed to show up for

8    my appearance in order for the divorce process to start

9    and for my spouse support.

10    Q.    Did you get spouse support?

11    A.    Not yet.

12    Q.    Did you get an order for spouse support?

13    A.    Not yet.  What is the order support?

14    Q.    Well, did the judge tell Mr. Hu to pay you

15    money every week or every month?

16    A.    I didn't hear from that yet.

17    Q.    But that's one of the requests that you've

18    made?

19    A.    Um-huh.

20    Q.    Yes?

21    A.    Yes.

22    Q.    And that's because you're not working and you

23    need the money?

24    A.    Yes.

141

1 shelter income on your tax return.

2          A.      Under my name?

3          Q.      Well, yes.  You filed a joint tax return,

4 yes?

5          A.      I just know I get my salary out of that -- I

6 mean, my payment, hourly pay out of that.  That's it.  I

7 don't have any claim I purchased my own computer and

8 claim under System Communications.  No.

9          Q.      Well, did you ever charge Mr. Hu rent to live

10 in that house?

11          A.      Rent?  Officially, I don't charge him rent,

12 but I expect him to pay me monthly to run a family.

13          Q.      Okay.  And did he fulfill that?

14          A.      Yes.

15          Q.      How much would he typically give you?

16                          MR. FEINMAN:  Objection.

17          A.      Not regularly.  Once in a while, he give me a

18 System Communications' check and say -- and sign it to

19 me and say, This is for you, for the household.

20          Q.      And what did you do with those checks?

21          A.      I deposit in my bank.

22          Q.      Did you make the mortgage payments out of

23 that money, in part?

24          A.      No.  If you want to say that.  I mean, I have

157

1      Q.    And what is the rest of it?

2      A.    And I think the rest of it is -- Oh, okay.

3    That is the year he didn't live at home.  The first part

4    of the year, he is in Florida.  So I think that is the

5    time he give me his check from the company to do the --

6    to do the deposit temporary.  He put into my account so

7    I could use it for the kid, for -- I saw the Kaufman

8    there.

9      Q.    I'm trying to figure out where you got

10   $33,000.  That's what matters.

11     A.    I think this is the money, part of it, I

12   help him to put into his Kaufman account, the

13   investment.

14     Q.    And then you wrote checks for 28,000.  What

15   was the check for?

16     A.    I told you.  Part of it -- Can I flip through

17   this?

18     Q.    I'm trying to figure out where you were

19   working.

20               MR. FEINMAN:  Let her see the

21   document.

22     A.    I cannot tell you without reading it.

23               MR. FEINMAN:  Let her see the

24   document.

159

1    Q.    Well, thirty-three take away five is

2  twenty-eight, last time I checked.  Where did the other

3  twenty-eight thousand come from, ma'am?

4    A.    That may be the time that he give me the

5  money and put it into -- You know, he's not living at

6  home.  He deposit the money into my account so I can

7  help him to pay his thing, the check.

8    Q.    I see.

9    A.    The Kaufman.  I think it was his

10  investment.

11    Q.    So he would give you money to put in your

12  account; is that right?

13                    MR. FEINMAN:  Objection.

14    A.    No.  I just do him a favor when he wasn't

15  home.

16    Q.    You did a favor.  Isn't this your husband?

17    A.    So what?

18    Q.    Isn't this your husband?  You're doing him a

19  favor?

20                    MR. FEINMAN:  Objection.

21    A.    Of course.

22    Q.    I see.

23                    MR. FEINMAN:  There's not a question

24  to answer there.

161

1              BY MR. GANNETT:

2       Q.    Well, were you -- Here's your payroll account

3  from Rivier College.  It's $93.  It sounds like that's

4  what you were making, $93 a week or a month.

5       A.    In Rivier, yes.  I only worked for a few

6  hours.

7       Q.    Here's one for $68.24.

8       A.    Yes.  It's when I need to cut my hours in

9  there to make my money in System Communications.

10      Q.    And you're still testifying that he had no --

11  Even though it looks like he came up with $28,000 to put

12  into your account, he had nothing to do with that house?

13  That's your testimony?

14                   MR. FEINMAN:  Objection.

15      A.    Yes.

16      Q.    Just you?

17      A.    Um-huh.

18      Q.    Is this your handwriting here?  It's right

19  here on this.  Is this your handwriting?

20      A.    (Witness reviewing document.)  Yes.

21      Q.    Is this your handwriting too?

22      A.    (Witness reviewing document.)  Not this part

23  (indicating).

24      Q.    So just down here?